1

2

3

4

5                    UNITED STATES DISTRICT Court

6                  NORTHERN DISTRICT OF CALIFORNIA

7

8    ARTHUR GILBERT WALTERS,                    No. C-12-2799 EMC (pr)

9              Plaintiff,

10         v.                                   **ORDER GRANTING DEFENDANTS'**
                                                **MOTION FOR SUMMARY JUDGMENT**
11   SANTA CLARA DEPARTMENT OF
     CORRECTIONS, *et al.*,
12
               Defendants.
13   _____/

14

15              **I.    INTRODUCTION**

16         In this *pro se* civil rights action, Arthur Gilbert Walters claims that Defendants violated his

17   religious freedom rights in their response to his religious diet request at a county jail.  He alleged in

18   his complaint that the Halal religious diet that was provided to him was inadequate in that it

19   included less meat than provided in the regular diet, included margarine in place of meat, did not

20   include desserts, and had smaller meals.  He also alleged that correctional officer White threatened

21   him in connection with the diet.  Defendants now move for summary judgment and Walters opposes

22   the motion.  For the reasons discussed below, the Court **GRANTS** Defendants' motion for summary

23   judgment.

24              **II.    BACKGROUND**

25         The following facts are undisputed unless otherwise noted:

26         The events and omissions giving rise to this action occurred at the Santa Clara Department of

27   Corrections' Elmwood facility from about April 2012 through October 6, 2012, during which time

28   Mr. Walters was an inmate at that jail.

**United States District Court**
For the Northern District of California

1    Defendant Toby Wong was the facility captain at the Elmwood facility.

2    Defendant Joseph White was a correctional officer at the Elmwood facility.

3    Defendant Ana Regidor, a registered dietician, was the managing dietician for Santa Clara

4    County, responsible for planning meals at the jails.

5    A.    Mr. Walters' Requests For Religious Accommodations

6    Mr. Walters is a Muslim.  Upon his arrival at the Elmwood facility, he requested a Halal

7    religious diet in early April 2012.  *See* Docket # 1 at 21 (Mr. Walters' request for "no pork - Halal").

8    Chaplain Robinson granted his request.  Mr. Walters also requested and received a Quran, and later

9    a large-print Quran.  He also received a prayer rug for his use in praying.

10    According to chaplain Robinson, who oversaw the program at the Elmwood facility, the jail

11    made various provisions for Muslim inmates.

12    Inmates may pray in their cells or on the sundeck at Elmwood.
      Elmwood also encourages volunteer Imams (Islamic prayer-leaders)

13    and Muslim laypeople to visit with inmates.  These visits are designed
      to [meet] the particular religious needs of the inmates; the inmates

14    may learn about the Qur'an, discuss personal issues or pray with the
      volunteers.  Those Muslim inmates who wish to follow Ramadan are

15    served their meals before sunrise and after sunset in order to follow
      the rules of that holiday.

16

17    Docket # 22 (Robinson Decl.) at 2.

18    Mr. Walters requested and received counseling services from chaplain Robinson, another

19    chaplain, and several Muslim volunteers during his confinement at Elmwood.

20    B.    Food Service At Elmwood

21    Food was prepared on site at the several Santa Clara County jails, except for the Halal and

22    Kosher meals discussed below.  Approximately 73 employees staffed two kitchens, two warehouses,

23    a bakery, and two dining halls to serve almost 12,000 meals per day.  The fiscal year 2012 food

24    services budget was more than eleven million dollars, with inmate food costs consuming more than

25    four million dollars of that amount.

26    Defendant Regidor was responsible for meal planning for the approximately 3,800 inmates

27    housed at the county jails, including the approximately 1,900 inmates at the Elmwood facility.

28    About 600-700 of the 3,800 inmates fed were on special religious and medical diets.  Special diets

United States District Court

For the Northern District of California

1  required additional staff and work in preparation and processing.  Ms. Regidor's duties included

2  planning and evaluating inmate meals for nutritional value.  The diets she planned included a regular

3  diet, eight medical diets, and three religious diets.

4        The regular jail diet was on a 28-day cycle.  Meat was served in 14 of the 21 meals per week

5  because generally there are no restrictions in the preparation of these meals.

6        Medical and religious diets do not have a 28-day cycle because of the restrictions of the

7  diets, such as limitations on the kinds of foods and methods of food preparation that comply with

8  those diets.  "[T]hese issues, together with the cost of the entrees, limit the variety of the menu that

9  can be served in these diets.  Low-salt, low-fat, and protein-controlled diets are limited to about five

10  different entrees for the whole 28-day cycle.  Religious vegetarian diets are limited to about eight

11  different entrees rotated in during the 28-day cycle."  Docket # 24 (Regidor Decl.) at 2-3.

12        The county jails had three religious diets.  A vegetarian religious diet was offered to inmates

13  whose religions require that they not eat meat.  A Kosher religious diet was offered to Jewish

14  inmates.  A Halal religious diet was offered to Muslim inmates.

15  C.     <u>A Halal Religious Diet Is Provided at Elmwood</u>

16        The Halal religious diet for the county jails was adopted by the County in the 1990s, after

17  consultation with the director of the Islamic Education and Information Center, who provided a

18  letter outlining Islamic dietary restrictions.  *See* Docket # 24 at 3; Docket # 24-1 at 1-2.  That letter,

19  still used in setting the Halal religious diet, described the dietary restrictions for "people of the

20  Muslim faith:" (1) fish, fish products, and all vegetable products were "OK for consumption;" (2)

21  pork and pork byproducts were prohibited; (3) Halal meat (i.e., "meat that has been slaughtered and

22  blessed according to the Islamic Legal System") was preferred but, failing that, "Kosher meat is an

23  acceptable substitute" as long as it had not made contact with or been preserved in any liquid

24  containing alcohol, which was totally forbidden to Muslims; and (4) utensils used to prepare the

25  meals had to be kept separate and should have had no contact with any pork or alcoholic products.

26  Docket # 24-1 at 1.

27        The limitations of the Halal religious diet provided challenges in an institutional food setting,

28  such as the jail.  The vendors that provided meat for other diets at the Elmwood facility did not have

**United States District Court**
For the Northern District of California

Halal or Kosher meat and the kitchen was not set up to prepare Halal food or to slaughter animals in accordance with Islamic law. Docket # 24 at 4.

> ln order to provide Halal and Kosher meals, the County contracts with two outside vendors J&M and My Own Meals, which provide pre-packaged vegetarian meals that meet Halal/Kosher requirements, as well a certified Halal pre-packaged meat meal and a certified Kosher pre-packaged meat meal. These meals are served hot with various side dishes served cold. The meals are Pasta with Garden Vegetables, Cheese Tortellini, Vegetarian Stew, Florentine Lasagna and Beef Stew. Each of these meals other than the Beef Stew is vegetarian. For the purpose of decreasing cost and increasing logistical efficiency, the only difference between the Halal and Kosher versions of the diet is the Beef Stew. Inmates on the Halal/Kosher diet receive a certified Halal or Kosher version the Beef Stew one out of every two lunches and other vegetarian pre-packaged dinners the rest of the time.

Docket # 24 at 4.

The Halal religious diet was more nutritious than the regular diet at the Elmwood facility. *Id.* at 5. The Halal religious diet provided approximately 3,240 calories per day whereas the regular diet provided 2,767 calories per day. *Id.* The Halal religious diet also had more protein, less sodium, and less fat than the regular diet. *Id.*

The Halal religious diet included many pats of margarine.

> Margarine pats are provided to inmates on religious diets and protein-controlled diets. Inmates on religious diets receive six small pats of margarine with each meal. A pat of the margarine Reddies weighs .12 ounces. The dimensions of the pats are 1.5" x 1.25" by .33 cm. Three margarine pats are approximately 63 calories, 7 grams of fat, and low in cholesterol. The pats are provided to meet state standards requiring that fat must be added in minimum amounts to add palatability and to provide calories. Bread is served with every religious meal and margarine is a palatable compliment to the bread. Other diets have condiment-type items like mayonnaise and salad dressings, which are served with meals that are prohibited on the religious diets.

Docket # 24 at 4-5.

The Halal religious diet had a more limited dessert offering than the standard diet. The Halal religious diet had fruit for the dessert, while the regular diet had fruit or baked goods such as cake for dessert. *Id.* at 5. The County did not provide baked desserts in the Halal religious diet because it could not ensure that the pots and pans used for baking such desserts for the regular diet would not have come in contact with prohibited products. *Id.*

4

**United States District Court**
For the Northern District of California

1   There was less variety in the Halal religious diet than the regular diet.  The dietician

2   explained that this was due to the "religious guidelines on how meals are to be prepared for religious

3   diets, budgetary constraints, and the need to simplify our operations. Vegetarian entrees are served

4   to both Halal and Kosher diets at dinner time. There is less meat in the Halal/Kosher diet because the

5   meat Halal/Kosher meals cost more than the vegetarian meals and there are logistical and staffing

6   demands associated with delivering Halal and Kosher meat meals (which must be differentiated) that

7   do not exist when delivering vegetarian meals (which are served on both the Halal and Kosher

8   diets)."  Docket # 24 at 5-6.

9   The Halal religious diet was more expensive to the County to provide than the regular diet.

10   In fiscal year 2012, the Halal/Kosher diet cost the County $8.27 per day whereas the regular diet

11   cost an average of $2.76 per day. The Halal/Kosher vegetarian meals cost $2.82 per prepackaged

12   box on average. The certified-Halal pre-packaged meat meal cost $3.12.  *Id.* at 5.

13   If an inmate was approved for a Halal/Kosher diet, he received that diet without

14   modification.  An inmate could opt out of the religious diet at any time.  Tailoring diets to meet

15   particular requests of an inmate would have increased food and labor costs, and would have required

16   the dietician to do a separate calculation of the nutritional composition of that inmate's meals.

17   *See id.* at 6.

18   D.   Mr. Walters Disliked The Standard Halal Religious Diet Provided

19   This civil rights action is largely about certain features of the standard Halal religious diet

20   that was provided to Mr. Walters that he did not like.

21   Mr. Walters thought there should be more meat in the Halal religious diet than the 3-4 times

22   meat was served each week.  He admitted in his deposition, however, that a wholly vegetarian diet

23   was permissible for a rule-abiding Muslim and that there was no requirement of meat consumption

24   to be a Muslim.  Docket # 20-1 at 16-17.  Mr. Walters further testified that eating a lot of meat was

25   his personal preference.  *Id.* at 17.

26   Mr. Walters also thought he should receive baked desserts, which the Halal religious diet did

27   not include.

28

United States District Court

For the Northern District of California

1      Mr. Walters thought there should have been more variety in the meals than was available in

2  the standard Halal religious diet, which rotated through 3-4 different types of entrees. *See* Docket

3  # 20-1 at 25.  He does not dispute (and his handwritten chart plainly shows) that there were other

4  foods in the meal in addition to the entrees.  *See* Docket # 1 at 16-20.

5      Mr. Walters also thought the Halal religious diet meals were "smaller" than the regular diet

6  meals.  Docket # 20-1 at 25.

7  E.    <u>Officer White's Alleged "Threat"</u>

8      Under Santa Clara County jail rules, inmates were not permitted to trade food.   Rule 2-19d

9  provided that "[i]nmates shall have in their possession only those items issued by the jail, purchased

10  at commissary or approved by custody staff."  Docket # 23 at 32.  Under the rule, "[a]ny food that an

11  inmate received from another inmate would be considered contraband because it was not issued to

12  that particular inmate."  Docket # 23 (Fischer Decl.) at 2.   According to correctional lieutenant

13  Fischer, the jail's rule against possession of contraband, "as applied to food trading, is enforced out

14  of concern that certain inmates would coerce other inmates into giving away their food.  Inmates

15  often try to trade food to acquire fruit to make pruno (jail-made alcohol); use as commerce to pay off

16  gambling debts; or as show of force because one inmate is high-ranking in a gang or physically

17  larger.  Permitting inmates to have food that is not assigned to them can result in other inmates not

18  receiving enough food and otherwise cause disturbances and conflict within the jail.  The

19  Department is particularly concerned that inmates assigned a medical or religious [diet] receive the

20  food they are assigned since there is a specific reason they have the designated food."  Docket # 23

21  (Fischer Decl.) at 2.

22      Officer White refused to allow Mr. Walters to trade any of his food with inmates on the

23  regular diet, and refused to allow Mr. Walters to receive extra food portions from the inmate food

24  workers.  Docket # 20 (Mr. Walters Depo.) at 28-30.  On May 9, 2012, Officer "White

25  communicated to [Mr. Walters] that if [Mr. Walters] kept on trading meals, he was going to have

26  [Mr. Walters'] diet stopped."  *Id.* at 34; *see also* Docket # 1 at 5.

27      On June 3, 2012, Mr. Walters attempted to return his meal to officer White and to show

28  officer White his research about the kind of meals he was supposed to get, officer White – who was

United States District Court

For the Northern District of California

in the middle of food service and who had no role in planning the meals he served – responded that he did not care, and tried to shut the door.  *See* Docket # 20 at 27, 36-37.  Officer White told Mr. Walters "he'd punch me in my throat if I ever got in his way again" during food service.  *Id.* at 39.[1] Officer White then continued serving meals, and Mr. Walters "began to laugh and grabbed a grievance" from the stack under his bed.  *Id.* at 41.

Officer White did not tell Mr. Walters to stop practicing his religion.  *Id.* at 38.  In fact, officer White never said anything to Mr. Walters about his Muslim religion.  *Id.* at 43.  And, notwithstanding officer White's comment that he would stop the religious diet if Mr. Walters continued to trade food, Mr. Walters' religious diet was not stopped.  *Id.* at 34-35.  Mr. Walters did, however, continue to trade meals – but made sure to do it when officer White was not on duty.  *Id.* at 35.

### III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")  The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue

---

[1]  Mr. Walters described the incident in a grievance he filed that day – including his efforts to "refuse [his] illegal dinner tray . . . and hand it back to officer White," which prompted officer White to threaten to him.  *See* Docket # 7 at 8.  Officer White's response on that grievance stated: "Mr. Walters expressed his dissatisfaction toward his Halal meal.  I told him to write a grievance[.] I went to close his door and he threw his foot out and stopped the door from closing.  I informed him if he ever stopped me from closing his door again he would be subjected to disciplinary action."  *Id.*  At the summary judgment stage, the Court accepts the non-moving party's version as true.

United States District Court

For the Northern District of California

of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324 (citations omitted.)  The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at 631.

On issues as to which the moving party bears the burden of proof at trial – such as the qualified immunity defense in this case – he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense.  *Id.* at 1537.  Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Mr. Walters' complaint (docket # 1) and "supplemental to relief" (Docket # 7) are considered as evidence because they were signed under penalty of perjury.

## IV.   DISCUSSION

A.   Exhaustion Of Administrative Remedies

Defendants have moved for summary judgment on the ground that Mr. Walters did not exhaust his administrative remedies before filing this action.  This argument must be rejected

**United States District Court**

For the Northern District of California

1    because Defendants presented their argument in the wrong sort of motion and without adequate

2    notice to Mr. Walters.

3        A nonexhaustion defense should be raised in an unenumerated Rule 12(b) motion rather than

4    in a motion for summary judgment. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).

5    "[W]hen a district Court will consider materials beyond the pleadings in ruling upon a defendant's

6    motion to dismiss for failure to exhaust administrative remedies, the pro se prisoner plaintiff must

7    receive a notice, similar to the notice described in *Rand [v. Rowland*, 154 F.3d 952 (9th Cir. 1998)

8    (en banc))]." *Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012).  However, a *Rand* notice about

9    summary judgment procedures will not suffice when the government seeks dismissal for failure to

10   exhaust administrative remedies.  *See id.* at 1008-09.  The *Stratton* notice must be provided to the

11   *pro se* prisoner at the time the motion is filed.  *Id.*  That notice must explain that the motion to

12   dismiss is similar to a motion for summary judgment in that the Court will consider materials

13   beyond the pleadings; that the plaintiff has a right to file counter-affidavits or other responsive

14   evidentiary materials; and the effect of losing the motion.  *Id.*  A *Rand* notice will suffice but only if

15   it is tailored to address the proper vehicle of a Rule 12(b) motion to dismiss for failure to exhaust.

16   *Id.* at 1008, n.3.

17       Here, Defendants filed a motion for summary judgment, rather than an unenumerated motion

18   to dismiss required by *Wyatt*.  Moreover, at the time they filed their motion, they did not provide the

19   precise notice required by *Stratton*.  These procedural deficiencies require rejection of the non-

20   exhaustion argument.  The Court thus proceeds to Defendants' arguments that they are entitled to

21   summary judgment on the merits of Mr. Walters' RLUIPA and § 1983 claims.

22   B.    RLUIPA Claims

23       The Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-

24   1, provides that no state may impose a "substantial burden" on an inmate's exercise of religion

25   unless the action or policy in question provides the least restrictive means of serving a compelling

26   governmental interest. 42 U.S.C. § 2000cc-1(a).  RLUIPA does not define "substantial burden." *See*

27   42 U.S.C. § 2000cc-5.  The Ninth Circuit, however, has held that a "substantial burden" on

28   "religious exercise" is one that imposes "a *significantly great* restriction or onus upon such

9

exercise." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1125 (9th Cir. 2013) (quoting *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)) (emphasis added). "Religious exercise," for RLUIPA purposes, includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The exercise of religion may involve not only the belief and profession, but the performance of physical acts such as group assembly for worship. *See Greene v. Solano County Jail*, 513 F.3d 982, 987 (9th Cir. 2008).

The plaintiff bears the burden of coming forward with evidence demonstrating the state's action or policy constituted a substantial burden on his exercise of religion. *Warsoldier v. Woodford*, 418 F.3d 989, 994-95 (9th Cir. 2005). The focus of this initial inquiry necessarily is on the manner in which the plaintiff's religious exercise is impacted, rather than on the reasonableness of the facility's policy or regulation. *Id.* at 995. Once the plaintiff has met his initial burden of showing a substantial burden on his exercise of religion, the burden shifts to the government to show that the burden imposed is in furtherance of a "compelling" government interest (rather than simply a legitimate penological interest), and that it achieves the compelling interest by the least restrictive means. *See* 42 U.S.C. § 2000cc-1(a); *Shakur v. Schriro*, 514 F.3d 878, 889 (9th Cir. 2008).

Defendants have demonstrated the absence of a genuine issue of material fact in support of Mr. Walters' claim that the Halal religious diet provided at the jail substantially burdened his religious exercise. The undisputed evidence is that Mr. Walters asked for and received a Halal religious diet that did not contain pork products. The undisputed evidence shows that: (1) the Halal religious diet provided at the jail did not violate any tenet of Mr. Walters' Muslim religion; (2) the Halal religious diet was constructed after consultation with an Islamic leader; (3) the Halal religious diet provided was nutritionally adequate and had more calories than the regular diet; (4) Mr. Walters received Halal meat every other day and had vegetarian alternatives on the remaining days; (5) Mr. Walters' Muslim religion did not require that he eat meat or any particular quantity of meat; and (6) Mr. Walters' Muslim religion did not require that he eat meals with variety or with baked desserts.

**United States District Court**
For the Northern District of California

Mr. Walters wanted a Halal religious diet with attributes different from the one served to him.  He wanted a diet that contained more meat than the one portion offered every other day, more baked goods for dessert, and more variety.  The evidence is undisputed, however, that these preferences were personal preferences rather than religion-based preferences.  The features of the Halal religious diet that Mr. Walters found disagreeable simply did not impose "'a significantly great restriction or onus,'" *Hartmann*, 707 F.3d at 1125, upon the exercise of his Muslim religion.[2] No reasonable jury could conclude, on the evidence in the record, that the failure to provide a meatier Halal religious diet with more baked desserts and a greater variety amounted to a substantial burden on Mr. Walters' exercise of his Muslim religion.  *Cf. Shakur*, 514 F.3d 889 ("extent to which the prison's policies" resulting in a denial of religious dietary request "pressured Shakur to betray his religious beliefs is another factual dispute to be resolved by the district court"); *id.* (quoting *Warsoldier*, 418 F.3d at 996) ("prison policy that 'intentionally puts significant pressure on

---

[2]  Courts have repeatedly rejected RLUIPA and First Amendment claims where the dietary request is a matter of personal preference rather than based on religion. *See, e.g.*, *Kretchmar v. Beard*, 241 F. App'x 863 (3d Cir. 2007) (RLUIPA and First Amendment claims were properly rejected because non-rotating Kosher menu served cold and that did not comply with prison's general menu operating guidelines that required a rotating menu and two hot meals per day did not substantially burden inmate's religious exercise); *id.* at 865 (while plaintiff "may prefer a wider variety of hot meals, the diet he currently receives" – which was religiously compliant and met his nutritional needs – "is not the type of burden that puts substantial pressure on him to modify his behavior and violate his beliefs"); *DeHart v. Horn*, 227 F.3d 47, 52 (3d Cir. 2000) ("if a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the *Turner* inquiry"); *Riley v. DeCarlo*, 2012 WL 4378569, *5 (W. D. Penn. 2012) (granting summary judgment for Defendants on plaintiffs' religious freedom claims where no-animal-product-diet offered indisputably excluded all the ingredients plaintiff claimed to be religiously unacceptable; "[p]laintiff seems to be attempting to force Defendants to cater to his ill-defined personal preferences, which is not cognizable under the Free Exercise Clause"); *Gailbreath v. Covert*, 2011 WL 3475544, *7-8 (W. D. Penn. 2011) (finding plaintiff's First Amendment freedom of religion and RLUIPA claims to be without merit where plaintiff requested and received a non-pork diet requested for religious reasons but did not receive a vegetarian diet he requested for non-religious reasons); *see also id.* at 8 (vegetarian diet requested "'for cholesterol reasons'" was "not religious in nature" and therefore the "denial of the same did not place any substantial burden on Plaintiff's religious exercise"); *Moore v. Cucchi*, 2011 WL 4594907, *3-*4 (D. N.J. 2011) (granting summary judgment against plaintiff on his RLUIPA and First Amendment claims because plaintiff did not allege facts showing that the non-meat diet he was served violated his Buddhist beliefs even though that diet did not satisfy his personal preference for a lacto-vegetarian diet; "an inmate has no constitutional right to a diet based on personal preference"); *Strope v. Cline*, 2010 WL 3721700, *7 (D. Kan. 2010) ("it is 'axiomatic that the free exercise clause of the first amendment does not offer its protections to mere personal preferences;'" granting summary judgment against plaintiff on his First Amendment and RLUIPA claims where plaintiff had expressed no religious necessity for the foods omitted from the diet, or religious prohibition against the repetitive nature of the menu offered).

**United States District Court**
For the Northern District of California

1    inmates . . . to abandon their religious beliefs . . . imposes a substantial burden on [the inmate's]

2    religious practice'").

3         Mr. Walters has presented a chart showing some of his dinners with notations of the calorie

4    content of the vegetarian entrees in those dinners in support of his assertion that he received smaller

5    meals than inmates on the regular diet. *See* Docket # 1 at 16-20. For example, his chart shows that

6    on April 29, 2012, he received as an entree a 260-calorie vegetarian stew while the regular diet

7    inmates received a beef patty and a portion of mixed vegetables. *Id.* at 17. His evidence is so

8    incomplete that it fails to show any triable issue of material fact. First, no information is provided

9    about the food served for breakfast and lunch on any of the days for which he lists the dinner menu

10   so one cannot determine the overall caloric content of the Halal religious diet or the regular diet on

11   any given day. Second, the chart cannot even be used to determine the caloric content of just the

12   dinner because the entree for which he provides a calorie count is only part of the dinner. *See e.g.,*

13   *id.* at 17 (Mr. Walters' April 29, 2012 dinner also included 2 jelly packs, 6 cubes of butter, 2 milks,

14   1 apple, and 2 pieces of wheat bread; the regular diet also included 1 portion of potatoes, 1 milk, 1

15   fruit dessert bar, and 2 pieces of wheat bread). Meaningful comparisons of the Halal religious diet

16   and the regular diet cannot be made with his chart because he did not provide the calorie counts for

17   all the foods on the dinner menu, and because the chart provided absolutely no information about the

18   other meals served on each of the listed days. No reasonable jury could find that the Halal religious

19   diet was nutritionally deficient or nutritionally inferior to the regular diet based on Mr. Walters'

20   chart.

21        Mr. Walters has contended that he received many margarine pats, which he viewed as

22   impermissible replacements for the meat he desired. Mr. Walters has failed to show that he has any

23   personal knowledge of the reason for the inclusion of the margarine pats in his meals. By contrast,

24   Defendants have presented a declaration from the trained dietician who planned the meals, who

25   explained that the margarine pats were included to provide the required amount of fat and calories,

26   and to add palatability to the meals. Also, the chart submitted by Mr. Walters showed that

27   vegetarian entrees and other foods accompanied the margarine pats for each of the listed dinners.

28   Mr. Walters' unsupported conjecture that the margarine pats were meat substitutes is not sufficient

**United States District Court**
For the Northern District of California

1    to create a triable issue of material fact.  On the evidence in the record, no reasonable jury could find

2    that the jail was serving margarine pats as a meat substitute, or serving margarine pats to discourage

3    the Halal religious diet.  *Cf. Scott v. Harris*,  550 U.S. 372, 380-83 (2007) ("When opposing parties

4    tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

5    jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a

6    motion for summary judgment.")

7    　　　　Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr.

8    Walters, no reasonable jury could conclude that the Halal religious diet offered him did not amount

9    to a substantial burden on his religious exercise.  Defendants are entitled to judgment as a matter of

10   law on the claim that the jail's failure to provide a meatier Halal religious diet that had more baked

11   desserts and greater variety violated his rights under RLUIPA.

12   C.　　<u>First Amendment Free Exercise Claim</u>

13   　　　　The First Amendment provides that "Congress shall make no law respecting an

14   establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend I.  "The first

15   of the two Clauses, commonly called the Establishment Clause, commands a separation of church

16   and state.  The second, the Free Exercise Clause, requires government respect for, and

17   noninterference with, the religious beliefs and practices of our Nation's people."  *Cutter v.*

18   *Wilkinson*, 544 U.S. 709, 719 (2005).  Under the Free Exercise Clause, inmates "have the right to be

19   provided with food sufficient to sustain them in good health that satisfies the dietary laws of their

20   religion."  *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) (quoting  *McElyea v. Babbitt*, 833 F.2d

21   196, 198 (9th Cir. 1987)).  The free exercise right, however, is necessarily limited by the fact of

22   incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain

23   prison security.  *O'Lone v. Shabazz*, 482 U.S. 342, 348-49 (1987).  In order to establish a free

24   exercise violation, an inmate must show a defendant burdened the practice of his religion without

25   any justification reasonably related to legitimate penological interests.  *See Shakur*, 514 F.3d at 883-

26   84.

27   　　　　The Supreme Court has identified four factors for Courts to consider when determining

28   whether a regulation or practice is reasonably related to legitimate penological interests:  (1) whether

United States District Court

For the Northern District of California

there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives," or, in other words, whether the rule at issue is an "'exaggerated response' to prison concerns."  *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).[3]  The task in considering the *Turner* factors is not to balance the four factors, but, rather, to determine whether the state shows a "reasonable" relation between the policy and legitimate penological objectives, rather than simply a "logical" one.  *Beard v. Banks*, 548 U.S. 521, 533 (2006).  While all justifiable inferences must be drawn in the prisoner-plaintiff's favor with respect to matters of disputed fact, the Court's inferences must accord deference to the views of prison authorities in disputed matters of professional judgment.  *See id.* at 529-30.

Defendants are entitled to judgment as a matter of law on Mr. Walters' First Amendment claim because Mr. Walters has failed to show a triable issue of fact in support of his claim that Defendants burdened the practice of his Muslim religion.  Mr. Walters acknowledged in his deposition that he was not required by his faith to eat meat, to have baked desserts, to have a variety of foods, and to have larger portions.   On the evidence in the record, no reasonable jury could find that Mr. Walters was not "provided with food sufficient to sustain [him] in good health that satisfies the dietary laws of [his] religion."  *Ward*, 1 F.3d at 877 (citation omitted).

Even assuming arguendo that Mr. Walters' evidence had raised a triable issue of fact that Defendants burdened the practice of his religion, his Free Exercise Clause claim would fail because the evidence indisputably shows that the Halal religious diet that was provided at the jail passes muster under the *Turner* test.

With respect to the first *Turner* factor, the undisputed evidence shows a rational and valid connection between the county jail's religious diet program that provided a *standardized* Halal religious diet and a legitimate governmental interest.   The "orderly administration of a program that

---

[3]  The *Turner* test applies to the constitutional claims, but not the RLUIPA claim. *See Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008).

United States District Court

For the Northern District of California

1   allows . . . prisons to accommodate the religious dietary needs of thousands of prisoners" is a

2   legitimate governmental interest.  *Resnick v. Adams,* 348 F.3d 763, 769 (9th Cir. 2003) (first *Turner*

3   factor satisfied because requiring inmate to fill out a standardized form to obtain a religious diet was

4   rationally connected to the orderly administration of the common fare program in federal prison

5   system); *see also Sefeldeen v. Alameida*, 238 F. App'x 204, 206 (9th Cir. 2007) ("the legitimate

6   governmental interest is to reasonably accommodate thousands of inmates' religious dietary needs

7   while also considering budgetary, staff, and security limitations").  The Santa Clara County

8   Department of Corrections has a legitimate government interest in running a simplified, orderly and

9   cost-efficient food system that provides standardized religious diets.  Allowing a custom religious

10   diet that is tailored to an individual inmate's personal (rather than religious) preferences undermines

11   that legitimate governmental interest.  There is a valid rational connection between jail officials'

12   interest in a simplified, orderly and cost-efficient food system and their refusal to provide Mr.

13   Walters with a meatier Halal religious diet with more baked desserts and greater variety.

14   *See Shakur*, 514 F.3d at 878 (prison could rationally conclude that denying kosher diet to Muslim

15   inmate would simplify its food service and reduce expenditures); *Ward*, 1 F.3d at 877 ("Since the

16   policy of not providing special diets is related to simplified food service, the first factor weighs in

17   favor of the government").  The first *Turner* factor weighs in favor of Defendants.

18        The second *Turner* factor is "whether there are alternative means of exercising the right that

19   remain open to prison inmates."  *Turner*, 482 U.S. at 89-90.  The policy of providing only standard

20   Halal religious diets did not deprive Mr. Walters of all means of exercising his Muslim religion.

21   *See O'Lone*, 482 U.S. at 352-53 (although there were no alternative means for the inmates on work

22   detail to attend Jumu'ah services, the inmates nevertheless retained their ability to participate in

23   other Muslim religious ceremonies and practices, and that ability supported the reasonableness of

24   the restriction).  Mr. Walters could have prayed using the prayer rug provided to him at the jail,

25   could have read the Quran provided to him at the jail, and could have obtained meals at times that

26   allowed him to observe Ramadan.  Mr. Walters also could have visited with volunteer Imams and

27   Muslim laypeople who were encouraged to visit the jail to discuss Muslim and personal issues, and

28   prayed with the inmates.  Mr. Walters retained "the ability to participate in other significant rituals

United States District Court

For the Northern District of California

1    and ceremonies" of his faith, even if some aspects of religious practice had been restricted.

2    *See Ward*, 1 F.3d at 877.  The second *Turner* factor weighs in favor of Defendants.

3           The third *Turner* factor requires the Court to consider the "impact accommodation of the

4    asserted constitutional right will have on guards and other inmates, and on the allocation of prison

5    resources generally." *Turner*, 482 U.S. at 90.   Providing a custom Halal religious diet for Mr.

6    Walters would have adversely affected the allocation of jail resources by disrupting the simplified

7    food services system beneficial for feeding 3,800 inmates.  The third *Turner* factor weighs in favor

8    of Defendants. *See DeHart v. Horn*, 390 F.3d 262, 271-72 (3d Cir. 2004) (providing religious vegan

9    diet would burden prison administration because it would require specialized ordering and

10   preparation of food and individualized preparation of meals in kitchen designed for bulk food

11   preparation).

12          The fourth *Turner* factor requires the Court to consider whether there is an "absence of ready

13   alternatives" to the prison policy.  *Turner*, 482 U.S. at 90.  The burden is on the inmate challenging

14   the regulation to show that there are obvious, easy alternatives to the regulation. *See O'Lone*, 482

15   U.S. at 350; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1063 (9th Cir. 1999).  Mr. Walters has not put

16   forth a ready alternative to Defendants' religious diet policy that would accommodate his specialized

17   diet at a minimal cost or minimal disruption of the orderly operation of the simplified food service

18   program.  The meat entrees and baked foods from the regular diet could not be provided to him

19   because the meat was not Halal and the foods had potential cross-contamination with pork and

20   alcohol forbidden by his religion.  *Cf. Ashelman v. Wawrzaszek*, 111 F.3d 674, 677 (9th Cir. 1997)

21   (reversing and remanding on free exercise claim because lower Court had not taken into consider

22   evidence that a variety of foodstuffs could be assembled to provide meals that were consistent with

23   kosher diet request where "most of these things are 'off-the-shelf' and nothing in the record suggests

24   that the cost would be appreciable.") Mr. Walters has not shown that providing Halal meat entrees in

25   14 of 21 of the weekly meals could be done as an obvious and easy alternative, in light of the extra

26   cost of the Halal meat entrees, and provides no evidence about the ease with which Halal baked

27   desserts could be provided with all meals. The fourth *Turner* factor weighs in Defendants' favor.

28

United States District Court
For the Northern District of California

Having considered the *Turner* factors, the Court concludes that Mr. Walters has not raised a triable issue of fact that his right to free exercise of religion was improperly impinged upon by Defendants' policy.  Defendants are entitled to judgment in their favor on Mr. Walters' First Amendment claim.

D.       Equal Protection Claim

Mr. Walters has contended that prison officials treated him differently from inmates of other faiths, in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment. Specifically, he has contended that prison officials provided members of other religions meat with almost every meal and baked desserts.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In the prison or jail context, the Equal Protection Clause requires that an inmate who is an adherent of a minority religion be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts," *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (Buddhist inmates must be given opportunity to pursue faith comparable to that given Christian inmates), as long as the inmate's religious needs are balanced against the reasonable penological goals of the prison, *O'Lone*, 482 U.S. at 349.  An inmate cannot prevail on his equal protection claim "if the difference between the Defendants' treatment of him and their treatment of [other] inmates is 'reasonably related to legitimate penological interests.'" *Shakur*, 514 F.3d at 891 (citations omitted).

Mr. Walters has failed to show a triable issue of fact in support of his equal protection claim. Although Mr. Walters was served less meat than inmates on the regular diet, the undisputed evidence shows that the difference was attributable to the dietary restrictions associated with his Muslim religion, combined with the nutritional standards for the jail, and the budgetary and logistical constraints associated with providing Halal meat with all meals.  Likewise, although he did not receive baked desserts, this difference was attributable to the dietary restrictions associated with his religion, combined with the nutritional standards for the jail, and the budgetary and logistical

1    constraints associated with providing such foods.  The Equal Protection Clause's requirement that

2    all similarly situated people are to be treated equally "does not mean, however, that all prisoners

3    must receive identical treatment and resources."  *Hartmann*, 707 F.3d at 1123 (rejecting equal

4    protection claim by Wiccan inmates who asserted that prison administration denied a full-time

5    Wiccan chaplain intentionally and without regard to the extent of their needs in light of plaintiffs'

6    admitted access to a volunteer Wiccan chaplain and staff chaplains of other religions).

7         Even if Mr. Walters had shown unequal treatment, he has provided no evidence of

8    discriminatory intent based on his religion.  Mr. Walters has urged the failure to provide parity in

9    meat between the Halal and regular diets shows that he was the subject of discrimination.

10   *See* Docket # 28 at 2 (citing 15 Cal. Code Regs. § 3054.3 ("Religious meat alternatives (meat that

11   has been certified as halal) shall be available at all institutions."))   Assuming arguendo that the

12   regulation applies to the county jail (which Defendants dispute), the regulation says nothing about

13   the particular quantity of Halal meat that generally must be served – other than that there must be

14   some religious meat alternate made available, which indisputably did occur here.  That regulation

15   also does not require any equivalence between the quantity of meat in the regular diet and the Halal

16   religious diet.  In any event, failure to comply with the regulation does not imply intentional

17   discrimination based on religion, particularly in the context of the accommodations provided to

18   inmates of the Muslim faith at the jail.

19        Further, even if there was unequal treatment, Defendants' actions pass muster under the

20   *Turner* test for the reasons discussed in the preceding section.  Prisons and jails need not provide

21   identical facilities or services to different faiths, but must make good faith accommodation of the

22   inmates' rights in light of practical considerations.  *See Freeman v. Arpaio*, 125 F.3d 732, 737 (9th

23   Cir. 1997), *overruled on other grounds as stated in Shakur*, 514 F.3d at 884-85.   The same *Turner*

24   analysis that requires rejection of Mr. Walters' free exercise claim requires rejection of his equal

25   protection claim.   The legitimate penological interests of cost control, a simplified and efficient

26   food service plan, justified the decision not to provide customized Halal religious diets in addition to

27   the Halal religious diet that did satisfy the dictates of the Muslim religion.   Having considered the

28   several *Turner* factors, the Court concludes that Mr. Walters has not raised a triable issue of fact that

**United States District Court**
For the Northern District of California

1  his right to equal protection was improperly impinged upon by Defendants.  Defendants are entitled

2  to judgment in their favor on Mr. Walters' Fourteenth Amendment Equal Protection Clause claim.

3  E.     Claims Against Officer White

4          Defendant officer White also is entitled to summary judgment on the claims that he violated

5  Mr. Walters' rights under RLUIPA and the First Amendment by admonishing that he would stop the

6  Halal religious diet if Mr. Walters continued to trade food with inmates on the regular diet.  There is

7  no evidence that Mr. Walters was trading his Halal food for other Halal food; indeed, the evidence in

8  the record suggests he was obtaining food that did not comply with the requirements for a Halal diet,

9  e.g., desserts cooked in pots and pans that may have been cross-contaminated with pork or alcohol.

10  Additionally, Mr. Walters has admitted that his Halal religious diet never was stopped as a result of

11  his food-trading.  No reasonable jury could conclude that the inmate's exercise of his Muslim

12  religion was substantially burdened by an insistence that he adhere to the diet he had demanded to

13  exercise his religious beliefs.  Regardless of the sternness of officer White's words, he did not

14  impede the exercise of Mr. Walters' Muslim religion when he refused to let Mr. Walters obtain food

15  from other inmates.  *See, e.g., Blount v. Ray*, 2009 WL 2151331, *8 (W. D. Va. 2009) (removal of

16  inmate from religious diet program after he was caught trading meals did not substantially burden

17  the inmate's exercise of his religion).

18          Officer White's verbal threat also did not amount to a substantial burden on Mr. Walters'

19  religious exercise in violation of his RLUIPA rights.  The evidence is undisputed that officer White

20  never said anything to Mr. Walters about his Muslim faith.  The evidence also shows that Mr.

21  Walters was interfering with food service when officer White threatened to punch him in the nose if

22  he did so again, and that Mr. Walters laughed when officer White made the statement.  Although

23  these kinds of statements are certainly not desirable, no reasonable jury could conclude that officer

24  White's statement that he would punch Mr. Walters if he interfered with food service again

25  amounted to a substantial burden on Mr. Walters' exercise of his Muslim religion or violated his

26  First Amendment rights.  Officer White is entitled to judgment as a matter of law on the RLUIPA

27  claims.

28

United States District Court

For the Northern District of California

1    Officer White's verbal threat also did not violate Mr. Walters' First Amendment right to the

2    free exercise of religion.  Allegations of mere threats are not cognizable under § 1983 as

3    constitutional violations.  *See Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (mere threat does not

4    constitute constitutional wrong, nor do allegations that naked threat was for purpose of denying

5    access to Courts compel contrary result).  Even if a mere threat were cognizable under § 1983, the

6    evidence is undisputed that the threat pertained to Mr. Walters' disruption of the meal service:

7    although Mr. Walters wanted to lecture the deputy about the religious meals that he admits deputy

8    White did not plan, there is no evidence that disrupting meal service or lecturing jail staff about

9    religious meals was part of Mr. Walters' religion or that the threat burdened his religion.  There is no

10   evidence that officer White's action was taken to punish Mr. Walters for his religious exercise as

11   opposed to his interference with White's work.

12   F.    Qualified Immunity Defense

13       Defendants are entitled to qualified immunity against Plaintiff's claims.  The defense of

14   qualified immunity protects government officials "from liability for civil damages insofar as their

15   conduct does not violate clearly established statutory or constitutional rights of which a reasonable

16   person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether

17   an official is entitled to qualified immunity, the Court must decide whether the facts alleged show

18   the official's conduct violated a constitutional right; and, if so, whether it would be clear to a

19   reasonable officer that his conduct was unlawful in the situation he confronted.  *Saucier v. Katz*, 533

20   U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s

21   requirement that qualified immunity analysis proceed in a particular sequence).  "[I]f no

22   constitutional right would have been violated were the allegations established, there is no necessity

23   for further inquiries concerning qualified immunity."  *Saucier*, 533 U.S. at 201.  The Court has

24   concluded that the evidence fails to show a violation of Mr. Walters' RLUIPA or First or Fourteenth

25   Amendment rights.  Therefore, Defendants prevail on the first prong of the *Saucier* test.  As a matter

26   of law, Defendants are entitled to qualified immunity against Plaintiff's claims.

27

28

**United States District Court**
For the Northern District of California

1

## V.    <u>CONCLUSION</u>

2      For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.

3    (Docket # 19.)  Accordingly, judgment will be entered in Defendants' favor and against Plaintiff.

4    The Clerk shall close the file in this case.

5

6      IT IS SO ORDERED.

7

8    Dated:  September 19, 2013

9                                                                        _____

10                                                                     EDWARD M. CHEN
                                                                        United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28